UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


GARY S. HANN,

        Plaintiff,

                                           CASE NO. 05-CV-71347-DT
   v.                                    JUDGE PAUL D. BORMAN
                                          MAGISTRATE JUDGE PAUL KOMIVES

STATE OF MICHIGAN, et al.,

        Defendants.

_____/

## REPORT AND RECOMMENDATION ON DEFENDANTS THYAGARAJAN, QAYYAM, DAOUST, AND MEYERS'S MOTION FOR SUMMARY JUDGMENT (docket #128)

I.      RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
II.    REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
      A.    *Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
      B.    *Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
      C.    *Legal Standards* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
           1.    *Summary Judgment Standard* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
           2.    *Eighth Amendment Standard* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
      D.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
           1.    *Discontinuation of Celexa* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
           2.    *Treatment of Thyroid Condition* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
      E.    *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
III.   NOTICE TO PARTIES REGARDING OBJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

\*       \*       \*       \*       \*

I.      __RECOMMENDATION__: The Court should grant the medical defendants' motion for summary judgment (docket #128).

II.     __REPORT__:

A.    *Procedural Background*

      Plaintiff Gary S. Hann is a former state prisoner who, at the time he filed his complaint, was confined at the Muskegon Correctional Facility in Muskegon, Michigan.  Plaintiff commenced this

*pro se* civil rights action on April 7, 2005, bringing claims pursuant to 42 U.S.C. §§ 1983 and 1985; the First, Fourth, Fifth, Sixth, and Eighth Amendments to the Constitution; the Suspension Clause, U.S. CONST. art. I, § 9, cl. 2; the Employee Income Retirement Security Act (ERISA); the Internal Revenue Code (IRC); and Michigan common law.  Defendants are: the Michigan Department of Corrections (MDOC); the Michigan Parole Board, Board Chairman John S. Rubitchun, and Board members James L. Quinlan, Margie McNutt, and John/Jane Doe #1 ("Parole Board defendants"); Oakland County; Oakland County Prosecutor David G. Gorcyca and assistant prosecutor Kimberly Brown ("Oakland Prosecutor defendants"); Oakland County Sheriff's Department employees Joseph Duke and Jeff Hamm ("Oakland Sheriff defendants"); Washtenaw County; Washtenaw County Prosecutor Brian L. Makie; the City of Ypsilanti; Ypsilanti employee George Basar and Ypsilanti Police Officers A. Coppock, B. Yuchasz, and John M. Barr ("Ypsilanti Police defendants"); Michigan Attorney General Michael A. Cox and Assistant Attorney General Victoria A. Reardon ("Attorney General defendants"); Charles Schwab & Company, Inc. ("Schwab"); MDOC physicians Dr. Qayyum and Dr. Thyagaragan, and health care professionals J. Daoust and P. Meyer ("medical care defendants"); Thomas M. Loeb, plaintiff's attorney in a criminal case in Oakland County; John D. Roach, plaintiff's appellate attorney in the Oakland County Case; Cheryl Farmer, the Mayor of Ypsilanti at the times relevant to this complaint; and Carol Clare, the Ypsilanti Assessor.  All defendants are sued in their individual and, where applicable, official capacities.  Plaintiff's complaint raises nine causes of action against defendants.  Specifically, the causes of action break down as follows:

| Count | Compl. ¶¶ | Legal Claim | Defendants |
| --- | --- | --- | --- |

| I | 29-79 | Wrongful parole classification; denial of due process and equal protection by parole board | State of Michigan, Michigan Parole Board, Parole Board defendants |
|---|---|---|---|
| II | 80-133 | Unconstitutional arrest, search and seizure, invasion of privacy, denial of bail, false imprisonment, and malicious prosecution | State of Michigan, Oakland County, Oakland Prosecutor defendants, Oakland Sheriff defendants, City of Ypsilanti, Ypsilanti defendants, Farmer |
| III | 134-191 | Unconstitutional search and seizure, invasion of privacy, denial of due process, breach of contract, ERISA violation | State of Michigan, MDOC, Schwab, Attorney General defendants, Oakland County, Gorcyca |
| IV | 192-238 | Deliberate indifference to medical needs | State of Michigan, MDOC, medical care defendants |
| V | 239-281 | Denial of due process and First Amendment rights in connection with major misconduct proceeding | State of Michigan, MDOC |
| VI | 282-300 | Denial of First Amendment right of access to courts | State of Michigan, Oakland County, Oakland Prosecutor defendants, Roach |
| VII | 301-331 | Denial of Sixth Amendment right to effective assistance of counsel | State of Michigan, Oakland County, Oakland Prosecutor defendants, Loeb, Roach |
| VIII | 332-379 | Ethnic intimidation, denial of free speech and privacy rights, denial of equal protection in connection with property assessments | State of Michigan, City of Ypsilanti, Washtenaw County, Basar, Barr, Farmer, Clare |
| IX | 380-431 | Malicious prosecution | Washtenaw County, Makie, City of Ypsilanti, Barr, Basar, Farmer |

Through both a preliminary Order of Partial Dismissal and a later Order adopting several Reports and Recommendations issued by me addressing the parties various dispositive motions, the Court has dismissed all of plaintiff's claims except for his Eighth Amendment claim against the medical care defendants (Thyagarajan, Qayyum, Daoust, and Meyer) relating to their handling of

his medications. All other medical claims against these defendants have been dismissed, as have the remaining claims against the other defendants.

The matter is currently before the Court on the medical care defendants' motion for summary judgment with respect to plaintiff's remaining medical claim, filed on February 27, 2009. Defendants argue that they are entitled to summary judgment because plaintiff cannot establish a genuine issue of material fact with respect to whether he had a serious medical need, nor with respect to whether they were deliberately indifferent to that medical need. Plaintiff filed a response to the motion on December 4, 2009, and defendants filed a reply on December 17, 2009.

B.    *Factual Background*

Plaintiff's claims against the medical care defendants are set forth in Count IV of his complaint. In this Count, plaintiff alleges that he is disabled and has no thyroid. He was taking Celexa and Synthroid daily for his conditions. Plaintiff alleges that the medical care defendants have denied him Celexa and have inadequately provided him with Synthroid. He has been unable to sleep and has been getting infections over his body as a result of his poor treatment. Plaintiff also alleges that he is prone to falling out of bed, yet has been denied a bottom bunk; that defendants have failed to treat his gum disease, and that defendants have failed to provide a needed root canal and crown for a lost tooth filling. Plaintiff alleges that the medical defendants' conduct constitutes deliberate indifference to his medical needs and violates the Americans with Disabilities Act. Plaintiff also alleges that defendants Qayyum and Daoust retaliated against plaintiff's grieving the issue of his Synthroid medication by treating him angrily, insisting that he did not know how to take his medication, and requiring that he be administered his Synthroid by medical staff. As noted above, only plaintiff's claim relating to his medication remains before the Court.

With respect to this claim, the evidence submitted by the parties, in particular the medical records attached to defendants' motion, establish the following. Plaintiff suffers from hypothyroidism secondary to thyroidectomy for thyroid cancer. *See* Def.'s Br., Ex. A, at 266. On December 13, 2002, shortly after plaintiff's incarceration commenced, defendant Thyagarajan prescribed 0.25 mg Synthroid daily with three refills to treat plaintiff's condition, and ordered blood tests. *See id*. at 1251-52. A lab report dated December 26, 2002, showed plaintiff's thyroid-stimulating hormone (TSH or thyrotropin) as high. *See id*. at 1188. In response, on January 13, 2003, defendant Thyagarajan issued an order to increase plaintiff's Synthroid to 0.5 mg daily,[1] and ordered a TSH blood test. *See id*. at 1249. Defendant Meyer, a nurse practitioner, saw plaintiff in a chronic care clinic on January 31, 2003, and noted his Synthroid of 50 mcg with a thyroid panel in March and a follow up in 6 months. *See id*. at 1105.

On February 29, 2003, defendant Daoust, a physician's assistant, ordered plaintiff's Synthroid at 0.5 mcg with four refills. She also requested that the TSH be repeated at his next blood draw. *See id*. at 1245-46. Again, on March 3, 2003, defendant Daoust ordered the Synthroid at 0.5 mcg with four refills. Dr. Hutchinson, in following plaintiff in the infectious disease clinic, also ordered a TSH test on March 5, 2003. *See id*. at 1245. Defendant Daoust noted on March 26, 2003, following up on the infectious disease clinic, that his Synthroid should continue at 0.5 mg. On April 25, 2003, a lab report showed plaintiff's TSH as high, but his Synthroid was decreased. *See id*. at 1177. According to defendant Daoust's treatment notes dated April 25, 2003, in the infectious disease follow up plaintiff insisted on decreasing his Synthroid to 0.25mg, as he insisted the TSH

---

[1]The medical records alternatively prescribe doses using milligrams (mg) or micrograms (mcg). A dosage of .5 mg is equal to a dosage of 500 mcg.

was controlled on this dose. She scheduled a follow up in six months for the chronic care clinic and one month to follow up on the TSH level. *See id.* at 1091.

Dr. Hutchinson saw plaintiff in the infectious disease clinic on April 29, 2003. At that time, he noted that plaintiff was doing well, and had hypothyroidism secondary to thyroidectomy and under dosing secondary to a medication prescribing error. He returned plaintiff to his chronic dose of l-thyroxine for 60-90 days, and then wanted to check the TSH to see if this dose was adequate. *See id.* at 1076. Dr. Hutchinson then entered physician's order to cancel the synthroid/l-thyroxine order. He ordered "L-thyroxin 0.25mg = 250 micrograms PO daily x 30 days x 5 refills - do not restrict." He requested the prescription be filled that day at Duane Waters Hospital, the prison hospital, and cancelled the TSH order of April 24, 2003. He then ordered blood work for the week of June 16, 2003, including the TSH level, and ordered a return to the infectious disease clinic the week of July 7, 2003. *See id.* at 1242. On April 30, 2003, Dr. Qayyum then also entered physician's orders to discontinue, or d/c, the previous order of Synthroid. He ordered Synthroid 50 microgram for 2 weeks, then an increase to Synthroid 100 micrograms with a TSH test on May 26, 2003. *See id.* at 1241.

A lab report on May 6, 2003, again showed that plaintiff's TSH was high. *See id.* at 1169. On May 19, 2003, defendant Daoust entered orders to insure that plaintiff was receiving Synthroid 100 micrograms, with a TSH done in 14 days and a follow up in a month. *See id.* at 1240. The same date she noted that the TSH report was pending, and they would have a new TSH in 14 days with the increased Synthroid dose as planned previously. *See id.* at 1086. On May 30, 2003, defendant Qayyum discontinued the Synthroid 100 microgram and changed the Synthroid to 150mcg. *See id.* at 1240. A lab report of that date showed the TSH as high. Defendant Qayyum questioned plaintiff's

compliance with the dosage, increased the Synthroid, and placed it on the restricted medication line. He indicated he would reorder the TSH test. *See id*. at 1175. On June 3, 2003, the lab report showed the TSH as still high, but lower than it had previously been. *See id*. at 1170. On June 11, 2003, a second lab report showed the TSH as high but improved. Defendant Qayyum noted the 100mcg dose produced this result and questioned whether Mr. Hann was complying with the dosage. *See id*. at 1174. Defendant Qayyum noted in follow up on June11, 2003, that plaintiff had a thyroidectomy and takes Synthroid replacement. Defendant Qayyum noted that plaintiff had been non-compliant even with restricted medications, that he had Synthroid and was taking the dose he liked. Plaintiff was educated about his thyroid medications and the need to be compliant. *See id*. at 1085. Defendant Qayyum ordered a TSH test on June 23, 2003, with a return in one month. *See id*. at 1239. A lab report on July 3, 2003, showed a TSH only slightly above normal. Defendant Qayyum noted that plaintiff was on a 150mg dosage daily; he increased the dosage to 175mg daily. *See id*. at 1167. On July 4, 2003, Dr. Qayyum noted again that plaintiff had hypothyroid secondary to thyroidectomy, and was on Synthroid 150mg/day, with his TSH in normal ranges. Plaintiff was otherwise doing well. Dr. Qayyum increased the dose of Synthroid from 150mg to 175mg, with a recheck in 2 days. *See id*. at 1079, 1238. On July 21, 2003, defendant Qayyum saw plaintiff, who stated he was doing well, and was taking his old Synthroid dose of 150mg PO QD at pill line. *See id*. at 1077. On July 21, 2003, Dr. Qayyum ordered the medical staff to check plaintiff's medicine in the pill line. Plaintiff needed to get a TSH test after two weeks following the increase in dose, with the medical staff to coordinate the dose increases and lab work. *See id*. at 1236.

On July 30, 2003, Dr. Hutchinson assumed care of plaintiff's hypothyroidism. He ordered a change of the Synthroid ( l-thyroxine) to 0.2mg PO daily, not restricted. *See id*. at 1073, 1236.

Defendant Qayyum saw plaintiff on August 6, 2003, in follow up and noted the prescription of Synthroid 200mcg and a follow up with Dr. Hutchinson on September 1, 2003. *See id*. at 1071. Dr. Qayyum saw plaintiff again on September 3, 2003, and ordered a TSH test. *See id*. at 1068, 1235. The lab report dated September 6, 2003, showed a low TSH level. Defendant Qayyum noted he was on 0.2mg Synthroid. *See id*. at 1164. On September 23, 2003, Dr. Qayyum noted that plaintiff wanted to leave his dose of Synthroid unchanged until he saw Dr. Hutchinson. *See id*. at 1069.

On November 3, 2003, defendant Daoust ordered follow up lab work for plaintiff, including a TSH test. *See id*. at 1064, 1234. Defendant Qayyum saw plaintiff in follow up regarding the infectious disease clinic on November 17, 2003, noting that he had hypothyroidism, was taking replacement for thyroid, and stated he was doing well and had a Synthroid dosage of 200mcg. *See id*. at 1065. A November 29, 2003, lab report showed a TSH level below normal. Defendant Qayyum noted plaintiff's Synthroid dosage at 0.2mg and indicated that plaintiff did not want to change the dose until he saw Dr. Hutchinson. *See id*. at 1162. Defendant Qayyum again saw plaintiff on December 18, 2003, (Page 1062) and did follow up on January 23 and March 15, 2004. *See id*. at 1045, 1056-57, 1062, 1232). Defendant Daoust did follow up on January 5, 2003. *See id*. at 1232. On February 6, 2004, defendant Daoust prescribed plaintiff a multivitamin. *See id*. at 1045. She also saw him on April 26, 2004, for a swollen neck. *See id*. at 1044, 1052. She followed up with plaintiff regarding his swollen neck on April 28, 2004. *See id*. at 1054.

On May 10, 2004, nurse practitioner Penny Rogers spoke with Dr. Hutchinson to consult regarding the ordering of Synthroid. Dr. Hutchinson indicated he would follow plaintiff and make any medication changes to Synthroid due to past problems with dosing. *See id* at 887. On June 10, 2004, plaintiff sent a health care kite requesting adjustment of his thyroid medication, and was told

he would see Dr. Hutchinson within the next two weeks. *See id*. at 865. On July 12, 2004, Rogers made a notation in the chart that Dr. Hutchinson would prescribe the Synthroid due to past problems with the dosage. *See id*. at 850. On September 2, 2004, Rogers noted that the Synthroid dose was decreased as recommended. *See id*. at 836. On September 15, 2004, Rogers noted that plaintiff had received the reduced strength of Synthroid and stated he was feeling better on the new dose. *See id*. at 831. On November 12, 2004, she noted that his Synthroid had been adjusted due to a low TSH level, and that previously he only would let Dr. Hutchinson make an adjustment. She noted she would do a repeat level in five weeks. *See id*. at 807. On December 20, 2004, Rogers noted plaintiff's TSH was gradually increasing, and that she would decrease the Synthroid again to bring the level to therapeutic range. She indicated she would follow up with a TSH test in January with other labs already ordered. *See id*. at 786.

On January 21, 2005, Rogers noted a dramatic change in plaintiff's TSH level from the previous test. She consulted with Dr. Hutchinson to discuss any potential problems with regulation of TSH related to his infectious disease medications, and Dr. Hutchinson indicated his dose should be increased back to 0.125mg with lab follow up in 3 months. No interference from his infectious disease medications was known. *See id*. at 767. Dr. Hutchinson ordered a TSH and other lab work for the week of May 1, 2005, with a return to the infectious disease clinic via telemedicine the week of May 30, 2005. *See id*. at 1267.

On April 23, 2005, after plaintiff filed his complaint in this Court, defendant Daoust ordered a TSH lab test for the following day. *See id*. at 1244. On April 25, 2005, defendant Daoust discontinued the Synthroid 0.5mg and ordered Synthroid 0.25mg restricted. She ordered a one month follow up with a TSH test in 10 days. *See id*. at 1243. This was the last Ms. Daoust or the

other defendants saw plaintiff.  Following his transfer to another institution, plaintiff continued to receive treatment for his thyroid condition, as well as for mental health issues, continuing until his release on parole in February 2008.  *See id*. at 124, 133, 139, 142, 144, 147, 155, 160, 164, 166-71, 173, 177, 183, 186-87, 194, 196, 200, 202, 204, 206-08, 212, 216, 218, 222, 224, 226, 230-32, 235, 245, 247, 251, 268, 270, 278, 281, 284, 320, 346, 415, 456, 554, 562, 564, 569, 636, 903.

C.      *Legal Standards*

1.      *Summary Judgment Standard*

Under Rule 56, summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Hedrick v. Western Reserve Care Sys.*, 355 F.3d 444, 451 (6th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)).  "A fact is material only if its resolution will affect the outcome of the lawsuit."  *Hedrick*, 355 F.3d at 451-52 (citing *Anderson*, 477 U.S. at 248).  In deciding a motion for summary judgment, the Court must view the evidence in a light most favorable to the non-movant as well as draw all reasonable inferences in the non-movant's favor.  *See Sutherland v. Michigan Dep't of Treasury*, 344 F.3d 603, 613 (6th Cir. 2003); *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

"The moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-moving party's case."  *Hedrick*, 355 F.3d at 451 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  To meet this burden, the moving party need not produce evidence showing the absence of a genuine issue of material fact.  Rather, "the

burden on the moving party may be discharged by 'showing' -- that is, pointing out to the district court -- that there is an absence of evidence to support the non-moving party's case." *Celotex Corp.*, 477 U.S. at 325. "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'" *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *see also*, FED. R. CIV. P. 56(e).

To create a genuine issue of material fact, however, the non-movant must do more than present some evidence on a disputed issue. As the Supreme Court has explained, "[t]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [non-movant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50. (citations omitted); *see Celotex Corp.*, 477 U.S. at 322-23; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Thus, "[t]he existence of a mere scintilla of evidence in support of the non-moving party's position will not be sufficient; there must be evidence on which the jury could reasonably find for the non-moving party." *Sutherland*, 344 F.3d at 613.

2. *Eighth Amendment Standard*

To state a viable § 1983 claim, a plaintiff must allege that: (1) he was deprived of a right, privilege or immunity secured by the Federal Constitution or the laws of the United States; and (2) the deprivation was caused by a person while acting under color of state law. *See Doe v. Wigginton*, 21 F.3d 733, 738 (6th Cir. 1994). The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. CONST. amend. VIII. In its purest sense, the Eighth Amendment proscribes cruel and unusual

punishment meted out in a penal or disciplinary sense. In its application by the courts, the amendment actually protects a wide assortment of interests. It proscribes disproportionate punishments, *see Weems v. United States*, 217 U.S. 349, 366-67 (1910), "unnecessary and wanton infliction of pain," *Gregg v. Georgia*, 428 U.S. 153, 173 (1976) (plurality opinion), and conduct repugnant to "evolving standards of decency," *Trop v. Dulles*, 356 U.S. 86 (1958) (plurality opinion). *See generally, Parrish v. Johnson*, 800 F.2d 600, 609 (6th Cir. 1986).

The Constitution "does not mandate comfortable prisons." *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981). On the other hand, it does not permit inhumane ones, and it is clear that "the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney*, 509 U.S. 25, 31 (1993); *see also, Farmer v. Brennan*, 511 U.S. 825, 832 (1994). The amendment imposes affirmative duties on prison officials, "who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Id*. (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)). If the offending conduct is not a criminal penalty, then it must reflect an "'unnecessary and wanton infliction of pain'" to come within the Eighth Amendment's prohibition on cruel and unusual punishment. *Ingraham v. Wright*, 430 U.S. 651, 670 (1977) (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). Such claims must satisfy both an objective and a subjective test. *See Farmer*, 511 U.S. at 834; *Wilson v. Seiter*, 501 U.S. 294, 297-300 (1991). Under this analysis, what constitutes "unnecessary and wanton infliction of pain" will vary depending on the nature of the alleged constitutional violation. *Hudson v. McMillian*, 503 U.S. 1, 5 (1992); *Brooks v. Celeste*, 39 F.3d 125, 128 (6th Cir. 1994). The plaintiff bears the burden of proving these

elements by a preponderance of the evidence. *See Brooks*, 39 F.3d at 127-28.

The objective prong asks whether the harm inflicted by the conduct is sufficiently serious to warrant Eighth Amendment protection. *See McMillian*, 503 U.S. at 8-9; *Rhodes*, 452 U.S. at 349 (1981). To satisfy this prong, the conduct must deprive the plaintiff of "the minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 349. The objective component is contextually driven and is responsive to "'contemporary standards of decency.'" *McMillian*, 503 U.S. at 8 (quoting *Estelle*, 429 U.S. at 103).

The subjective prong asks whether the officials acted with a sufficiently culpable state of mind; that is, was the conduct "wanton." *Wilson*, 501 U.S. at 302; *Moore v. Holbrook*, 2 F.3d 697, 700 (6th Cir. 1993). In determining whether an official acted wantonly, the court applies a "deliberate indifference" standard. *Wilson*, 501 U.S. at 302-03; *see Estelle*, 429 U.S. at 104-06. Under this "deliberate indifference" standard, "a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. A prison official is not free to ignore obvious dangers to inmates, and may be liable even if he does not know the exact nature of the harm that may befall a particular inmate. *See id.* at 843-44. However, prison officials may escape liability if they show that they in fact did not know of the obvious risk to the inmate's health or safety, or knowing of it, they acted reasonably under the circumstances. *See id.* at 844-45. In short, "'[d]eliberate indifference is the reckless disregard of a substantial risk of serious harm; mere negligence, or even gross negligence, will not suffice." *Wright v. Taylor*, 79 Fed. Appx. 829, 831 (6th Cir. 2003) (citing *Farmer*, 511 U.S. at 835-36; *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (en banc)).

Plaintiff claims that defendants denied medically necessary treatment are governed by these objective and subjective tests, as explained by the Supreme Court in *Estelle*, *supra*. In *Estelle*, the Court held that "[r]egardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983." *Estelle*, 429 U.S. at 105. Thus, a court faced with failure to treat claims has a two-fold inquiry: (1) does the plaintiff's complaint involve "serious illness or injury"?–*i.e*, the objective prong of the Eighth Amendment analysis; and (2) if so, were the defendants deliberately indifferent to this serious illness or injury?–*i.e.*, the subjective prong of the Eighth Amendment analysis. *See generally*, *Durham v. Nu'Man*, 97 F.3d 862, 868-69 (6th Cir. 1996).

D.    *Analysis*

1.    *Discontinuation of Celexa*

In his complaint, plaintiff alleges that defendants were deliberately indifferent to his medical needs by failing to prescribe Celexa, which he had been taking prior to his incarceration to treat depression. Because plaintiff has failed to provide any evidence that these defendants had any responsibility for treating his psychological condition, the Court should conclude that defendants are entitled to summary judgment. "To recover damages under 42 U.S.C. § 1983, a plaintiff must establish a defendant's personal responsibility for the claimed deprivation of a constitutional right." *Diebitz v. Arreola*, 834 F. Supp. 298, 304 (E.D. Wis. 1993). In other words, in order to state a claim under § 1983 "[a] plaintiff must allege facts, not simply conclusions, that show that an individual was personally involved in the deprivation of his civil rights. Liability under § 1983 must be based on the personal involvement of the defendant." *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998) (per curiam); *see also*, *Carr v. Parker*, No. 98-6395, 1999 WL

1206879, at *1 (6th Cir. Dec. 9, 1999); *Salehpour v. University of Tennessee*, 159 F.3d 199, 206 (6th Cir. 1998). Here, each defendant avers that medical service providers such as they are not allowed to prescribe psychiatric medications, and that such medication may be prescribed only by mental health staff. *See* Def.s' Br., Ex. B, ¶ 12; Ex. C, ¶ 22; Ex. E, ¶ 19; Ex. F, ¶ 24. Plaintiff makes no argument to the contrary in his response to defendants' motion. Because there is no genuine issue of material fact with respect to whether defendants were involved in the decision to not prescribe Celexa, the Court should conclude that defendants are entitled to summary judgment on this claim.

2.      *Treatment of Thyroid Condition*

With respect to the treatment of plaintiff's thyroid condition, the medical records establish as a matter of law that defendants were not deliberately indifferent to plaintiff's medical needs. The medical records demonstrate that defendants repeatedly responded to plaintiff's complaints, treated his condition, ran tests and conducted follow up, and upon his request transferred his treatment to Dr. Hutchinson. To be sure, the medical records show that all of plaintiff's providers might not have been on the same page in effectuating the treatment, that the treatment may have been ineffective, or that there may have been prescribing errors based on the use of both milligram and microgram units on plaintiff's various prescriptions. The voluminous evidence of defendants' efforts to treat the condition, however, fail to give rise to even a scintilla of evidence that defendants deliberately ignored or mistreated his condition for the very purpose of causing harm, which is what the Eighth Amendment prohibits. At most, the medical evidence gives rise to an inference that defendants were negligent or committed malpractice. Such an inference, however, is insufficient to demonstrate deliberate indifference under the Eighth Amendment. *See Wright*, 79 Fed. Appx. at 831 (citing *Farmer*, 511 U.S. at 835-36; *Williams*, 186 F.3d at 691). As the Supreme Court made clear in

*Estelle*, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106. "[A]n inadvertent failure to provide adequate medical care (such as medical malpractice) cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.'" *Estelle*, 429 U.S. at 107. In the medical context, therefore, mere negligence, or even gross negligence, is insufficient to establish an Eighth Amendment violation. "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake v. Lucas*, 537 F.2d 857, 860-61 n.5 (6th Cir. 1976). Thus, allegations of "an inadvertent failure to provide medical care . . . [or of] negligen[ce] in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Estelle*, 429 U.S. at 105-06; *see also*, *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. Aug. 4, 1999) (en banc). Thus, even if plaintiff's claim against defendants may rise to the level of negligence or malpractice, it does not rise to the level required to establish deliberate indifference to a serious medical need.

Nor does the alleged pattern of negligence over a course of time suffice to establish that defendants were deliberately indifferent to plaintiff's serious medical needs. A pattern of negligence in the treatment of a single condition is insufficient, standing alone, to demonstrate deliberate indifference, and because the deliberate indifference standard focuses on the mental state of the prison official, plaintiff may not aggregate the acts of the individual defendants to establish that, collectively, they were deliberately indifferent to his medical needs. *See Rouse v. Plantier*, 182 F.3d

192, 200 (3d Cir. 1999); *Stewart v. Murphy*, 174 F.3d 530, 537 (5th Cir. 1999).

Plaintiff's arguments in response to defendants' motion for summary judgment are unavailing. For example, plaintiff offers his own affidavit in which he disputes the adequacy of his treatment and suggests that many of his complaints were repeatedly ignored by defendants. This affidavit, however, is insufficient to displace the medical records kept by the prison in the ordinary course of its operations. *See Dulany v. Carnahan*, 132 F.3d 1234, 1240 (8th Cir. 1997) ("In the face of medical records indicating that treatment was provided and physician affidavits indicating that the care provided was adequate, an inmate cannot create a question of fact by merely stating that []he did not feel []he received adequate treatment."); *Bennett v. Reed*, 534 F. Supp. 83, 86 (E.D.N.C. 1981) ("In determining whether a prisoner has received adequate medical treatment, this Court is entitled to rely on the affidavits of medical personnel and prison medical records kept in the ordinary course of operation.").

Plaintiff also contends that the medical records are incomplete, and do not show the numerous serious infections he suffered allegedly as a result of defendants' inadequate treatment. Even assuming that such records would show what plaintiff alleges, however, plaintiff does not explain how they are relevant to the subjective prong of the deliberate indifference inquiry. Such records may bear on whether plaintiff's medical condition was objectively serious, but they would not show that defendants were deliberately indifferent to his condition. The medical records which have been submitted show that defendants continually treated or attempted to treat plaintiff's condition throughout his incarceration. The consequences of their alleged inability to properly do so may bear on whether the medical condition was serious or on the damages suffered by plaintiff, but they do not bear on whether defendants deliberately ignored or mistreated his condition.

Finally, plaintiff points to a letter prepared by Dr. Henry A. Shevitz. In this letter, addressed to attorney Clarence O. Dixon, Dr. Shevitz indicates that he reviewed plaintiff's medical records and, in the course of his review, "found deliberate indifference on the part of the CMS physicians regarding treatment of Mr. Hann's serious hypothyroid condition." Pl.'s Br., Ex. 3. He specifically points to defendant Qayyam's April 2003 change in medication "to a dose which was 100 of that [sic] required by Mr. Hann." In Dr. Shevitz's opinion, "this deliberate indifference breached the standard of care, resulting in serious impairment to Mr. Hann." *Id.* Even assuming that the Court could consider this letter in deciding defendants' motion,[2] it fails to establish a genuine issue of material fact which would preclude summary judgment. While a medical expert may opine on the appropriate standard of care and whether defendants complied with that standard of care, the question of deliberate indifference is a legal one not within the purview of an expert witness. As the Sixth Circuit has explained, "'deliberate indifference' is a legal term . . . . It is the responsibility of the court, not testifying witnesses, to define legal terms. The expert's testimony in this regard invaded the province of the court." *Berry v. City of Detroit*, 25 F.3d 1342, 1352 (6th Cir. 1994); *see also*, *Bradley v. City of Ferndale*, 148 Fed. Appx. 499, 507 (6th Cir. 2005); *Hygh v. Jacobs*, 961 F.2d 359, 364 (2d Cir. 1992) (testimony of expert that police officer's use of force was not "justified under the circumstances" was not admissible as expert testimony because it embraced the ultimate legal conclusion which was the province of the trier of fact); *Griffin v. City of Clanton, Ala.*, 932 F. Supp. 1357, 1358-59 (M.D. Ala. 1996) (affidavit of expert that defendant

---

[2]Letters and unsworn statements of witnesses "cannot be used to defeat summary judgment because they are unauthenticated, they are not in the form of an affidavit, and they do not indicate that they are 'made on personal knowledge' as required by Federal Rule of Civil Procedure 56(e)." *Cruz v. Aramark Services, Inc.*, 213 Fed. Appx. 329, 332-33 (5th Cir. 2007); *see also*, *Network Computing Servs. Corp. v. Cisco Sys., Inc.*, 152 Fed. Appx. 317, 321 (4th Cir. 2005); *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 191 (5th Cir. 1991).

police officers were "deliberately indifferent" and had used "unnecessary and unreasonable force" did not preclude granting of summary judgment in officers' favor); *Sanders v. Douglas*, 565 F. Supp. 78, 80 (C.D. Cal. 1983) ("An affidavit containing ultimate facts or conclusions of law cannot defeat a summary judgment motion under Rule 56(e). Indeed, legal conclusions "are totally ineffectual, and are not to be given any consideration or weight whatsoever.") (quoting *G.D. Searle & Co. v. Chas. Pfizer & Co.*, 231 F.2d 316, 318 (7th Cir. 1956)). Indeed, the deficiency in Dr. Shevitz's letter is evidenced by his conflating of the deliberate indifference standard with the standard of care, an element in a medical malpractice claim. *See* Pl.'s Br., Ex. 3 ("I have been requested to render an opinion regarding the standard of medical care rendered to Mr. Hann during his incarceration;" "It is my opinion that this deliberate indifference breached the standard of care . . . ."). Accordingly, Dr. Shevitz's letter does not provide probative evidence establishing a genuine issue of material fact with respect to whether defendants were deliberately indifferent to his serious medical need.

Plaintiff also contends that defendants' affidavits are insufficient because they are unsigned, self-serving, and are substantively similar indicating that they were prepared by counsel, rather than the affiants. These arguments are without merit. While the affidavits originally submitted with defendants' motion were unsigned, defendants have now submitted corrected, signed affidavits. Further, any affidavit by a party to a case is by nature self-serving. That an affidavit is self-serving is no basis for rejecting it. *See Paz v. Wauconda Healthcare & Rehabilitation Centre, LLC*, 464 F.3d 659, 664-65 (7th Cir. 2006); *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 57 (2d Cir. 1998). More importantly, it is the medical records which establish that defendants did not act with deliberate indifference, not defendants' averments that they acted

without deliberate indifference.  Finally, the drafting of affidavits by counsel "is generally the case for affidavits prepared in litigation," *Walker v. George Koch Sons, Inc.*, No. 2:07cv274, 2008 WL 4371372, at *5 (S.D. Miss. Sept. 18, 2008), and provides no basis for striking the affidavit so long as it is declared to be true under penalty of perjury by the affiant.  *See Solaia Tech. LLC v. ArvinMeritor, Inc.*, 361 F. Supp. 2d 797, 804 (N.D. Ill. 2005).

Finally, I note that plaintiff's outstanding motion to compel discovery does not preclude granting summary judgment to defendants.  In his motion to compel, plaintiff contends that defendants have failed to provide him with personal information and personnel files sought in his discovery requests, and have failed to provide the medical records showing the hundreds of infections he had while under defendants' care.  This outstanding discovery motion does not preclude summary judgment, for two reasons.  First, plaintiff does not argue in his response that summary judgment is premature because of the outstanding discovery, nor has he filed an affidavit pursuant to Rule 56(f).  That rule provides, in relevant part, that a court may deny a motion for summary judgment "[i]f a party opposing the motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition."  FED. R. CIV. P. 56(f).  As another court in this Circuit has explained:

> When a party opposing a motion for summary judgment believes that further discovery is needed to develop the issues addressed in the motion, that party must file an affidavit pursuant to Fed.R.Civ.P. 56(f) ("R.56(f)"), to "indicate to the district court its need for discovery, what material facts it hopes to uncover, and why it has not previously discovered the information." *Cacevic v. City of Hazel Park*, 226 F.3d 483, 488 (6th Cir. 2000). Rule 56(f) provides as follows:
>> Should it appear from the affidavits of a party opposing the motion [for summary judgment] that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as

is just.

Rule 56(f) is the means by which a party resisting a motion for summary judgment fulfills the "obligation to inform the district court of his need for discovery . . . ." *Cacevic*, 226 F.3d at 488 (quoting *Vance ex rel. Hammons v. United States*, 90 F.3d 1145, 1149 (6th Cir. 1996)). The party seeking additional discovery must "affirmatively demonstrate . . . how postponement of a ruling on the motion will enable him, by discovery or other means, to rebut the movant's showing of the absence of a genuine issue of fact." *Good v. Ohio Edison Co.*, 149 F.3d 413, 422 (6th Cir.1998) (internal quotation marks omitted).

The filing of a Rule 56(f) affidavit is no mere formality:

> We, like other reviewing courts, place great weight on the Rule 56(f) affidavit, believing that "[a] party may not simply assert in its brief that discovery was necessary and thereby overturn summary judgment when it failed to comply with the requirement of Rule 56(f) to set out reasons for the need for discovery in an affidavit." The Second Circuit Court of Appeals has similarly explained that "[a] reference to Rule 56(f) and to the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for a Rule 56(f) affidavit . . . and the failure to file an affidavit under Rule 56(f) is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate."

*Cacevic*, 226 F.3d at 488 (quoting *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir.1996)) (citations omitted) (alterations in original). "Where a party opposing summary judgment and seeking a continuance pending completion of discovery fails to take advantage of the shelter provided by Rule 56(f) by filing an affidavit, there is no abuse of discretion in granting summary judgment if it is otherwise appropriate." *Id.*

*Gencorp, Inc. v. AIU Ins. Co.*, 304 F. Supp. 2d 955, 960 (N.D. Ohio 2004); *see also*, *Gettings v. Building Laborers Local 310 Fringe Benefit Fund*, 349 F.3d 300, 305 (6th Cir. 2003); *Cacevic*, 226 F.3d at 488; *Evans*, 80 F.3d at 961. Thus "a party may not simply assert in its brief that discovery was necessary and thereby overturn summary judgment when it failed to comply with the requirement of Rule 56(f) to set out reasons for the need for discovery in an affidavit." *Evans*, 80 F.3d at 961 (internal quotation omitted); *see also*, *Whalen v. Century Communications*, No. 97-16572, 1999 WL 109630, at *1 (9th Cir. Dec. 10, 1998) ("An inadequate discovery time argument fails where the party complaining failed to take advantage of the procedural remedy offered in Rule

56(f).").

Here, plaintiff has not filed an affidavit pursuant to Rule 56(f) detailing the need for further discovery. *See Short v. Oaks Correctional Facility*, 129 Fed. Appx. 278, 281-82 (6th Cir. 2005); *Summers*, 368 F.3d at 887. Second, as explained above, defendants are entitled to summary judgment because there is no genuine issue of material fact with respect to whether petitioner can establish that defendants were deliberately indifferent to his serious medical needs. The personal information and personnel records that plaintiff seeks in his motion to compel are irrelevant to this issue. Further, as explained above, the records of plaintiff's infections may be relevant to establishing that his medical need was serious, but they would not demonstrate that defendants were deliberately indifferent in light of the extensive medical treatment he received for his thyroid condition. Thus, further discovery is not necessary. *See Chilingirian v. Boris*, 882 F.2d 200, 203 (6th Cir. 1989) (summary judgment not premature even though discovery had not been conducted where "there is no evidence that discovery would have disclosed disputed material facts in support of [plaintiff's] claim.").

E.    *Conclusion*

In view of the foregoing, the Court should conclude that there is no genuine issue of material fact, and that the medical record establishes as a matter of law that defendants were not deliberately indifferent to plaintiff's serious medical needs. Accordingly, the Court should grant defendants' motion for summary judgment.

III.    NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in FED.

R. Civ. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/Paul J. Komives
PAUL J. KOMIVES
UNITED STATES MAGISTRATE JUDGE

Dated: 2/25/10

The undersigned certifies that a copy of the foregoing order was served on the attorneys of record by electronic means or U.S. Mail on February 25, 2010.

s/Eddrey Butts
Case Manager

23